IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 8, 2005

## STATE OF TENNESSEE v. VINCENT MARCEL WILLIAMS, ALIAS VINCENT MARCEL WILKES

**Appeal from the Criminal Court for Hamilton County**
**No. 238162     Stephen M. Bevil, Judge**

_____

**No. E2004-00355-CCA-R3-CD - April 22, 2005**

_____

A Hamilton County Criminal Court jury convicted the defendant, Vincent Marcel Williams, of aggravated child abuse, a Class A felony, and reckless homicide, a Class D felony. The trial court sentenced him as a Range I, standard offender to concurrent sentences of twenty-five years for the aggravated child abuse conviction and four years for the reckless homicide conviction. The defendant appeals, claiming that (1) the evidence is insufficient to support his convictions; (2) the trial court erred by denying his motion to suppress evidence obtained in violation of Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966); (3) his right to a fair trial was violated when a police officer testified at trial concerning a polygraph test and the defendant's prior convictions; (4) the burden of proof was improperly shifted from the state to the defendant by the prosecutor's statements during closing argument; and (5) the trial court erred by refusing to apply or give sufficient weight to mitigating factors and by improperly applying enhancement factors in light of Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004). We affirm the defendant's convictions and sentences.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which NORMA McGEE OGLE and J. C. McLIN, JJ., joined.

Ardena J. Garth, District Public Defender; Donna Robinson Miller, Assistant Public Defender (on appeal); and Christian John Coder and Myrlene Marsa, Assistant Public Defenders (at trial), for the appellant, Vincent Marcel Williams, alias Vincent Marcel Wilkes.

Paul G. Summers, Attorney General and Reporter; Michelle Chapman McIntire, Assistant Attorney General; William H. Cox, III, District Attorney General; and Yolanda Mitchell and Boyd M. Patterson, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the death of the defendant's seven-month-old daughter on August 1, 2001. The cause of death was cardiopulmonary arrest due to a brain injury determined to be the result of shaken baby syndrome (SBS). During the investigation, the defendant gave the police a statement which implicated him in the victim's death. He was arrested and charged with aggravated child abuse and felony first degree murder. Following a jury trial, he was convicted of aggravated child abuse and the lesser included offense of reckless homicide.

Chattanooga Police Officer Jacques Weary testified at trial that he was on patrol duty on August 1, 2001, and that at 5:47 a.m. he responded to a "sick call" from the defendant's address. He said that when he arrived the victim was being placed into an ambulance and paramedics were administering cardiopulmonary resuscitation (CPR). He said the defendant told him that he had laid her down at approximately 3:00 a.m. and that when he returned to check on her at 5:30 a.m., she was lying face down, and he could not wake her. He said the defendant told him that he called the paramedics and attempted CPR on the victim.

Dr. Gregory A. Talbott, a physician at T.C. Thompson Children's Hospital, Chattanooga, and a specialist in pediatric intensive care, testified that he was at the hospital when the victim arrived and that he was the victim's attending physician, which meant he was responsible for all aspects of her care upon admittance. He said the emergency room staff had succeeded in reestablishing her pulse and heart rate before transferring her to the intensive care unit. He said that he provided medication and other support to stabilize her heart function and that he began tests to determine why she had gone into cardiac arrest. Referring to the victim's medical record, Dr. Talbott said his initial examination of the victim revealed the following: her limbs were completely limp; she showed no response to painful stimulus and no corneal response, the reflex which causes a person to blink when the eye is touched; no cough or gag reflex was present; her pupils were dilated and fixed; and she made no respiratory effort or spontaneous movements. He said this condition is generally described as "deeply comatose with no response to neurologic testing." He said his exam of the victim's eyes revealed retinal hemorrhaging, i.e., bleeding at the back of the eyes. He said a Computed Axial Tomography (CAT) scan of her brain revealed swelling and bleeding between the brain hemispheres as well as subdural bleeding, i.e., bleeding that occurs underneath the tissue covering the brain. He said that her blood chemistry tests were consistent with having had a cardiac arrest and that her blood clotting study was normal, meaning she did not have a propensity to bleed which may have explained the bleeding behind the eyes and in the brain. He said the only medical explanation for these findings, viewed collectively, was that the child had been shaken. He said an SBS diagnosis consists of brain injury, always accompanied by brain swelling and subdural bleeding, in addition to bleeding at the back of the eyes. When asked whether another explanation existed for this combination of injuries, Dr. Talbott replied he did not know of any other diagnosis that explained these specific findings, without evidence of a bleeding disorder or some cataclysmic external trauma.

Dr. Talbott testified that SBS occurs when a baby's brain, which is not yet tightly packed within the skull, experiences a rotational force which tears apart the tiny "bridging" veins running

from the skull to the brain. He said this causes blood to form around the brain, which of itself is not a real problem. He said the problem is that the brain tissue tears apart, which causes the brain to swell. He said a baby's brain is similar in consistency to "firm jello" and quite delicate. He said that he observed no evidence of external trauma on the victim, such as bruising or skull fractures, and that the external trauma necessary to produce brain injuries of this type would be very forceful, such as falling out of a multi-story building or being involved in a high-speed car accident. He said the victim's subdural and retinal hemorrhaging are characteristic of SBS and were not necessarily fatal. He said the sheering and tearing of the brain cells caused cardiopulmonary arrest, which stopped the victim's breathing. He said that in this case, the victim's head injury was so severe it was inconceivable that immediate symptoms would not exist, such as increased irritability, decreased consciousness, decreased ability to feed, possible vomiting, and seizures.

On cross-examination, Dr. Talbott acknowledged the victim's medical records reflected that she had vaccinations recently and that she had a fever and was "fussy" for two days afterward. He also acknowledged the medical records showed that when the victim arrived in the emergency room, her plastic breathing tube was in the esophagus but should have been in the trachea, and that this required her to be "reintubated," meaning the dislocated tube was reinserted into the trachea. He acknowledged the resulting lack of oxygen may have contributed to her brain injury. He said although improper placement of the breathing tube may have contributed to the victim's brain injury, it would not cause it. He also acknowledged that vaccinations could cause severe allergic reactions in children such as deafness, seizures, comas, and brain damage but said that an allergic reaction did not cause the injuries to the victim in this case.

Dr. Edward Burton, a pediatric radiologist at T.C. Thompson Children's Hospital, testified he interpreted a CAT scan performed on the victim when she arrived at the hospital. He said the results showed no skull fractures but revealed "hyperdensity" along the midline, indicating acute hemorrhage which probably occurred within three days of the scan. He said this indicated she was a victim of SBS, in the absence of major accidental trauma.

On cross-examination, Dr. Burton acknowledged that the scan revealed no broken bones and that the bleeding could have occurred as many as three days before the scan was done. He said improper intubation could cause the brain to swell but not to bleed.

Hamilton County Deputy Medical Examiner Dr. Stanton Kessler, a forensic pathologist, testified he performed an autopsy on the victim's body which revealed that she had suffered severe trauma to her head, most likely from shaking or "blunt trauma." He said the autopsy revealed microscopic bruises on the brain's surface, subdural hemorrhage, swelling of the brain, and bleeding in the covering of her eyes, an unusual condition indicating the trauma she experienced was extreme. He said that the victim's brain had swelled to the size of a small adult and that these conditions were incompatible with life. He said that the human eye and retina are extremely well-protected structures and that detached retinas are rare. He said the trauma to the victim's eye was extreme, which is significant because it indicated the amount of force involved. He said that the shaking was so bad it had begun to tear the victim's eyes out and that the optic nerves showed signs of hemorrhaging.

He said that the victim's brain was "totally disassembled" and that the swelling was merely a reaction to the tremendous trauma suffered. He said the cause of death was "bilateral subdural hematoma and marked cerebral edema due to blunt force impact," which he opined to be SBS. He said the amount of damage inflicted on the victim's brain would cause an "almost pure comatose state" within minutes of the injury, meaning she would have been unresponsive and not capable of purposeful movements.

On cross-examination, Dr. Kessler acknowledged that the victim had no external marks or trauma evident on her chin, mouth, and ribcage area and that no evidence of prior injuries existed. He disagreed that the types of injuries the victim suffered would result in a child being merely "fussy and irritable" and not hungry for a couple of days. With regard to possible complications from vaccinations, he said that he had seen many children die from vaccinations over the years but that they did not die "like this." When asked whether other doctors might disagree with his diagnosis, he said forensic pathologists would not disagree.

Chattanooga Police Detective Josh Meyer testified that he was assigned to the child abuse unit and that he was involved in the investigation of the victim's death. He said he received a telephone call at 6:50 a.m. on August 1, 2001, instructing him to go to T.C. Thompson Children's Hospital and check on the condition of a child. He said that when he arrived, he was informed that the victim had suffered retinal hemorrhaging and brain bleeding and that she might die as a result of the injuries. He said that the defendant and his wife were at the hospital and that he spoke with them to determine who had been with the victim and if she had a history of medical problems. He said he tape recorded his interview of the defendant at the hospital. The tape was played for the jury, during which the defendant related the following information: the victim had not shown any signs of illness or problems in the five days before her injuries, other than occasional crying like she was in some pain. She was in good health. On July 31, 2001, the defendant agreed to clean the house and asked April, his wife, to take the children and leave the house while he did so. April left with the victim and their other child, five-year-old Victoria, at approximately 2:00 p.m. and planned to return at 6:00 p.m. Rather than clean, however, the defendant "lounged around" and was not finished when April called the house. April returned with the two children at approximately 1:30 a.m. the next morning, but the defendant still had not finished cleaning the house. The victim appeared dazed to the defendant. April told the defendant the victim was teething and gave her some medicine. The defendant wanted to finish cleaning the house. April and Victoria left, but the victim stayed at home because the defendant offered to take care of her. He changed her diaper and put her to sleep. He checked on her at approximately 3:00 a.m., and she was still sleeping. When April called at about 4:00 a.m., the defendant checked on the victim again and noticed something was wrong. Her hands were purple, and she was gagging. The defendant called for the paramedics and attempted to perform CPR on the victim. The defendant said he was the only one at home with the victim when April and Victoria left at 1:30 a.m.

April Williams, the victim's mother, testified that on July 31, 2001, the defendant told her he wanted to clean their house. She said she also learned that day that her cousin's husband had been shot. She said she drove to her grandmother's house with the victim and Victoria and left them there

-4-

with another cousin while she, her grandmother, and her cousin went to the hospital to see her cousin's husband. She said she returned to her grandmother's house at approximately 5:00 or 6:00 p.m. She said she attempted to nurse the victim who would not attach to her breast and "didn't look right." She said she assumed this was because the victim was teething. She said that the victim was normally very active but that she was less active on that day. She said the victim did not appear to have trouble breathing and was not an abnormal color. She said that after approximately an hour, she took the children with her to her friend Nicole's house, stayed until 11:00 p.m., and then went to Wal-Mart. She said she purchased teething medicine at Wal-Mart and then drove home, arriving at 1:30 a.m. She said the defendant had not yet finished cleaning the house when they returned. She said that the defendant asked what was wrong with the victim and that she assured him the victim was just teething. She said that she left again with Victoria because the defendant agreed to finish cleaning the house by 6:00 a.m. She said the victim stayed at home with the defendant. She said she returned to Wal-Mart and called the defendant at 4:00 a.m. to tell him she would return home at 6:00 a.m. She said that when she arrived, police cars were everywhere. She said the defendant was hysterical and told her, "She stopped breathing, she stopped breathing, April." She said an officer drove her and the defendant to T.C. Thompson Children's Hospital. She said that the victim looked dazed and abnormal that day but that she would have sought medical attention if she had known the victim's condition was caused by anything other than teething.

On cross-examination, Ms. Williams said the victim looked in a daze and would not nurse properly after being at her grandmother's house. She said her older daughter, Victoria, was placed in state custody after the victim's death. She said that after the victim's funeral on August 11, 2001, she and the defendant discovered that the detectives wanted to talk to them. She said that they drove to the police service center for this purpose and that the detectives placed her in the hallway and took the defendant into another room when they arrived. She said that the next time she saw the defendant, he told her that he gave a statement to the detectives because they threatened to arrest her and to take Victoria away if he refused. She said he told her that the detectives promised to return Victoria the next day if he gave them a statement. She said they were still fighting to regain custody at the time of trial.

Jeanester Leanear, April Williams' aunt, testified that April drove her to the hospital on July 31, 2001. She said that Victoria and the victim stayed with her granddaughter at the house while they were gone for approximately thirty to forty-five minutes. She said April arrived between 4:00 and 5:00 p.m. and stayed until 8:30 or 9:00 p.m. She said that the victim was "just laying there," that she asked April what was wrong with the victim, and that April told her the victim was teething. She said she had no reason to believe that something happened to the victim while they were at the hospital.

Conswayla Terry, April William's cousin, testified that April, Victoria and the victim came to her house because her husband was in the hospital. She said her twelve-year-old daughter, Alicia Pickett, babysat April's children while they were gone. She said the victim had been sick the day before and was teething.

Chattanooga Police Detective Don Bickford testified that he was a homicide investigator and that he became involved with the investigation of the victim's death on August 4, 2001. He said he attended the autopsy and reviewed the case file to determine who had custody of the victim during the time before her injuries. He said that he and Detective Mathis wanted to talk to the victim's parents and that they left a message to that effect with the defendant's mother on August 11, 2001. He said the defendant and April Williams arrived at the police service center later that day. He said they spoke with the defendant first because he was the last person known to have contact with the victim before she was taken to the hospital. He said they left April seated in the hall and took the defendant to Detective Mathis's office for an interview at 3:47 p.m. He said they asked the defendant questions concerning the last hours of the victim's life to determine how she died. He said the defendant gave them the following information: At 2:30 p.m. on July 31, 2001, the defendant instructed his wife to take the children and leave for a while in order for him to clean the house. Although his wife was to return at 6:00 p.m., she did not return until 1:30 a.m. the next day. When his family arrived, the victim was alert. His wife breast fed the victim and gave her teething medicine. His wife agreed to leave again to allow him to finish cleaning. He changed the victim's diaper and put her to bed. His wife called at approximately 3:30 a.m. from Wal-Mart. He checked on the victim at that time and noticed she was breathing oddly and her fingers were turning purple. He called 9-1-1, performed CPR, and emergency personnel arrived and took the baby to the hospital.

Detective Bickford testified that at this point in the interview they were still uncertain as to who had injured the victim. He said they asked the defendant if the victim was his child and if he had a criminal record. He said the defendant replied he had nothing "major." He said that the defendant asked why the detectives suspected him and that they replied they were only gathering facts. He said they asked him if there was something he might have done to cause the injuries to his child. He said the defendant became visibly stressed afterward and told them that he may have been angry with his wife and may have bounced the baby on the bed. He said Detective Mathis halted the interview at that point and informed the defendant he was a suspect and no longer free to leave. He said that they read the defendant his Miranda rights, that he signed a rights waiver, and that they began tape recording the interview. He said the time was 4:48 p.m.

The tape recorded session was played for the jury and revealed the following: At the beginning of the interview, the defendant stated he was willing to give a statement concerning the incident. He admitted that he was angry with his wife and that they had an argument when she called at approximately 3:00 a.m. on August 1, 2001. He said that their argument woke up the victim who had been sleeping and that he went upstairs to check on her after their conversation. The interview continued as follows:

> [DEFENDANT]:      I pat her and I . . . I come back and I was . . . patting her real hard, you know, and she was . . . crying and I believe she was crying because . . . of the teeth, you know, and I picked her up and then I . . . laid her back

down but when I laid her back down I kinda like laid her down hard.

BICKFORD: When you picked her up did you pick her up gently or were you frustrated and mad at your wife because she hadn't been home and she's calling you and you think she's having an affair or something?

[DEFENDANT]: Yes.

BICKFORD: And you were real frustrated?

[DEFENDANT]: Yes.

BICKFORD: So when you picked up the baby how did you do it?

[DEFENDANT]: I . . . picked her up kindly like in a . . . strong force. I mean I kinda . .

BICKFORD: Yanked or jerked her up?

[DEFENDANT]: Jerked her up, yes, and laid her down on my shoulder and I . . . started like patting her real hard and then I . . . laid her back down and started, you know, I laid her back down on the bed and . . . it was like almost I was hitting.

BICKFORD: Ok.

[DEFENDANT]: But, you know, it was mostly like, you know, real . . .

BICKFORD: Ok. You're showing me with your hand like you're bouncing her. Was it like a basketball bouncing around the bed?

[DEFENDANT]: Yeah.

BICKFORD: And when you picked her up did you grab her? How do you grab her?

[DEFENDANT]: I grab her like . . . she was laying down on her back and I kindly like I jerked her up.

BICKFORD: She's laid on her back?

[DEFENDANT]: I mean she was laying on her stomach and I jerked her up and laid her back down on my chest.

BICKFORD: Ok. Did you do this forcefully, the whole act?

[DEFENDANT]: No, not in the whole act. I just picked her up.

BICKFORD: But you yanked her up real forcefully?

[DEFENDANT]: Yes.

BICKFORD: Ok. You just showed me like you grabbed her and yanked her up then placed her on your shoulders?

[DEFENDANT]: My shoulder and her head was like hanging off of my shoulder so like if I went to move her, you know, she had . . . her neck and stuff being so loose, you know, she . . . she'd hit my shoulder and was going back and forth down and I was doing it real hard and then I laid her back down, you know, quick, you know, like down to the ground.

BICKFORD: Yeah.

[DEFENDANT]: You know, right down to the bed and I was just doing it, you know, constantly. It was like I blanked out for a while. I was just doing it real hard.

BICKFORD: You were real angry with your wife?

[DEFENDANT]: Yes.

. . . .

-8-

BICKFORD:            And you said I'm bouncing her on the bed. Was she coming up off the bed with the forcefulness?

[DEFENDANT]:         Yes sir. You know how you can hold someone back and legs down?

BICKFORD:            Yes sir.

[DEFENDANT]:         And just the upper part was coming up, going up and down, you know . . . I had her back and her, like her diaper, you know, it was about that much you could hold her and I was just doing it.

BICKFORD:            But you had your hand over her back, over the diaper area and her hips?

[DEFENDANT]:         Yes and her hips, well just her back and her neck was just come up and hit the bed, up and down.

                     . . . .

BICKFORD:            Ok. And you say she bounced, her head and all was freely bouncing on the bed?

[DEFENDANT]:         Yes.

BICKFORD:            Between . . every time you'd mash on her and?

[DEFENDANT]:         Yes but I . . . believe it probably took place when I yanked her up and had her on my shoulder when . . . her chin was hitting this part of my shoulder and wadn't [sic] . . .

                     . . . .

BICKFORD:            You showed me with your arms like you're holding the baby up on your left shoulder.

-9-

[DEFENDANT]:    I'm sitting her, like I'm sitting on the edge of the bed and I'm just going back and forth real real hard and her . . . neck just (clicking sound).

BICKFORD:       She was . . her head . . you didn't stabilize her head while you were rocking back and forth?

[DEFENDANT]:    Right, right.

. . . .

BICKFORD:       And you went immediately upstairs to the baby right after having the argument with your wife?

[DEFENDANT]:    Yes. And that, when I laid her back, when I was through with her, when I got to myself and just look . . I just looked at her and then I went back downstairs. Something telling me to go back upstairs and that's when she wake. She's making a (snort) . . .

BICKFORD:       About what time was it that you laid her back down?

[DEFENDANT]:    Uh . . . I say it was probably 'bout, I say 'bout 3:30.

BICKFORD:       And you went back downstairs after laying her down?

[DEFENDANT]:    Yes.

BICKFORD:       And realized or calmed down and realized that you might have done something that might have hurt the baby?

[DEFENDANT]:    Yes.

BICKFORD:       Then you went back upstairs to check on the baby?

-10-

[DEFENDANT]:       Yes.

BICKFORD:         And you said she was making the . . .

[DEFENDANT]:       Like . . . she was gagging for air.

                  . . . .

BICKFORD:         You called, according to the 9-1-1 screen, the call come into 9-1-1 at [5:47], ok, and how long did you leave the baby unattended. You said it was about 3:30 when you were up there with the baby?

[DEFENDANT]:       Yes.

BICKFORD:         And picked it up from the bed, sat with it, rocking on the side of the bed letting it's head loosely, you know, bounce back and off your shoulder?

[DEFENDANT]:       Yes.

BICKFORD:         What did you do between the time you put the baby down and you called 9-1-1?

[DEFENDANT]:       Oh, I went back downstairs.

BICKFORD:         How long would you say that was?

[DEFENDANT]:       Probably 'bout, I say 'bout two (2) hours.

                  . . . .

BICKFORD:         Did you take a nap?

[DEFENDANT]:       Yes.

                  . . . .

[DEFENDANT]:       After I got through, you know, doing the bouncing her on the bed and shaking her and everything . . . I got control of myself and she

-11-

got quiet, I laid her back down and went back downstairs.

BICKFORD: Do you think you did the most of the shaking and all when you had her on your shoulder?

[DEFENDANT]: I . . yes. I believe I did most damages on . . . the shoulder, mostly on the bed.

. . . .

MATHIS: From the time April left about 1:30 to 2:15, whenever she left during that time frame did anybody else ever come over to the house?

[DEFENDANT]: Uh . . . no.

MATHIS: You were alone in the house with that baby?

[DEFENDANT]: Yes.

. . . .

MATHIS: And when you came in this room did I tell you that you were free to get up and leave at any time?

[DEFENDANT]: Yes.

MATHIS: That you weren't under arrest, you were free to leave and we just wanted to talk to you about what had occurred so we could try to figure out who had an opportunity to cause an injury, is that right?

[dd]: Yes.

MATHIS: And during the course of that I told you that I was beginning to think based on what you were telling me . . . did you not tell Investigator Bickford and I that when April left the baby was fine?

[dd]:              Yes.

                   . . . .

MATHIS:            And when I told you if that was the case and I needed you to explain to us why over the next four (4) hours something happened.

[dd]:              Right.

MATHIS:            You started acting a little nervous didn't you?

[dd]:              Yes sir.

MATHIS:            And did we sort of stop what we, well not sorta, did we not stop then and tell you that I thought it was time that we advised you of your rights because I thought you had something you wanted to tell us?

[dd]:              Yes.

MATHIS:            How have you been treated?

[DEFENDANT]:       Oh fair.  I been no . . . no disrespect, none.

MATHIS:            We haven't cussed you?

[DEFENDANT]:       No sir.

MATHIS:            Threatened you?

[DEFENDANT]:       No sir.

MATHIS:            Been . . . treated you like a gentleman?

[DEFENDANT]:       Yes.

MATHIS:            Nobody has even raised their voice have they?

[DEFENDANT]:       No.

Detective Bickford testified that toward the end of the taped interview, the defendant became distraught when he realized what he had done to his child and started to cry. He said that he brought the defendant's wife in to speak with him and that he heard the defendant tell her he was sorry.

Dr. Jacqueline Shaw, a pediatrician, testified that she had been the victim's doctor and had last seen her on June 25, 2001, for a routine check up. She said the victim received the vaccinations standard for babies and that her last vaccination was approximately one month before her death. She said that, generally, infants' injections are intramuscular and reactions, if any, are usually mild and localized, i.e., some swelling, redness, or low-grade fever. On cross-examination, she said the victim was a very healthy child.

The defendant testified and generally confirmed his wife's testimony concerning the events of July 31, 2001. With regard to the victim, he said she appeared dazed when his wife returned with her at 1:30 a.m. on August 1, 2001. He said that when he asked his wife about her condition, she informed him the victim was teething. He said his wife left the house again with Victoria. He said that he changed the victim's diaper, put her to sleep upstairs, and resumed cleaning the house. He said that at approximately 3:00 or 4:00 a.m. his wife called and that he was concerned because she was out so late. He denied that he was angry and that he raised his voice during their conversation. He said that the victim started crying after the telephone call and that he went upstairs to check on her. He said that he patted her on her diaper and that she went back to sleep. He said he slept for about two hours afterward and then went upstairs to check on the victim. He said he noticed that her fingers were blue and that she was gagging. He said he dialed 9-1-1 and attempted to perform CPR on the victim. He said that the paramedics arrived approximately five or ten minutes later and that he and his wife followed the victim to the hospital. He said he learned at the hospital that she had been shaken. He said he gave a statement to Detective Meyer while at the hospital.

The defendant testified that the victim was buried on August 10, 2001, and that the police contacted him the next day. He said that he and his wife drove to the police service center and that he spoke alone with Detectives Mathis and Bickford. He said he spoke with the detectives for forty-five minutes to an hour in an office with the door shut before they turned on the tape recorder. He said the detectives threatened to arrest him and take Victoria away from him if he did not cooperate. He said that he was not concerned for himself and that he gave a false statement to the detectives to protect his family. He said that the detectives promised him Victoria would be returned to her home the next day but that the police lied because this did not happen. He said he did not kill his daughter.

On cross-examination, the defendant claimed that he was not upset with his wife. He said the police would not accept his first story so he claimed he was angry with her to make his confession more plausible. He said that he made the statement with the hope that the prosecutor would continue to search for the truth but that this did not happen. He admitted that he was suspicious his wife might have been doing something wrong but said that he gave a false confession to protect her and keep his family together. He said that his plan was to lie and admit later that he had lied. He said he had not expected his confession would terminate the investigation into his daughter's death. This concluded the proof.

# I.  SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence was insufficient to support his convictions of aggravated child abuse and reckless homicide.  The defendant asserts that the evidence was circumstantial and that before he may be convicted on this basis alone, the circumstances must be so strong and cogent as to exclude every other reasonable hypothesis.  He argues that the victim's fatal injuries could have been sustained while she was under the care of her cousin, during the reinsertion of her breathing tube by emergency medical personnel, or as a result of her vaccinations or teething medication.  The state contends that the evidence was sufficient for the jury to find beyond a reasonable doubt that the defendant caused the victim's injuries.  We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).  We do not re-weigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state.  See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury.  See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone."  State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (quoting State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985)).

Reckless homicide is the reckless killing of another.  T.C.A. § 39-13-215.  Reckless conduct occurs when a person "acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or will occur."  T.C.A. § 39-11-106(a)(31).  A person commits Class A felony aggravated child abuse when that person knowingly treats a child under six years of age in such a manner as to inflict serious bodily injury.  T.C.A. §§ 39-15-401, -402.

The evidence presented at trial showed that the defendant was the only person with the victim for more than four hours before she was admitted to the hospital with severe brain injuries.  The defendant admitted he "jerked" or "yanked" the victim up and patted her "real hard" after he became angry with his wife.  He described how her head was hanging off his shoulder and that her neck and head were loose, "going back and forth."  He also described the clicking sound made by the victim's neck as he rocked her "back and forth real real hard" and said that afterward, he laid her down and took a nap.  When he returned, she was gagging for air and turning blue.  Shortly thereafter, the victim went into cardiac arrest and remained in a comatose state until her life support systems were terminated.

-15-

Dr. Talbott testified that his initial examination of the victim's eyes showed "retinal hemorrhaging," that the CAT scan revealed swelling and bleeding of the brain tissue, and that her blood chemistry tests were consistent with having had a cardiac arrest, but that her blood clotting study was normal. He said the only medical explanation for these findings was that the child had been shaken. He said that the sheering and tearing of the brain cells caused her cardiopulmonary arrest and that the victim's head injury was so severe it was inconceivable there would not be immediate symptoms. Dr. Kessler also testified that the victim suffered severe injuries to her head from shaking or "blunt trauma" and said that in this case the shaking was so bad it was beginning to tear the victim's eyes out. He concluded that the child was a victim of SBS and that the amount of damage to the victim's brain would cause an "almost pure comatose state" within minutes of the injury. Viewed in the light most favorable to the state, this evidence is sufficient for a rational jury to find beyond a reasonable doubt that the defendant was guilty of aggravated child abuse and reckless homicide.

The defendant argues that when a case is made by circumstantial evidence alone, "the circumstances must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). He contends other reasonable hypotheses were not excluded, i.e., that the victim's injuries and subsequent death could have been caused by his wife's cousin, who babysat the victim on July 31; the botched intubation procedure; or her reactions to vaccinations or teething medication. However, the prevailing medical opinion was that the cause of death was shaking, and the credibility of the expert witnesses who testified as to this issue was within the province of the jury. Although the defendant claimed his statement was false, he told the detectives that he shook the victim "real real hard." In this case, the jury accredited the testimony of the doctors and the defendant's statement, determining that the circumstances were sufficiently strong as to exclude the alternate hypotheses presented by the defendant.

## II. MOTION TO SUPPRESS

The defendant contends that the trial court erred by denying his motion to suppress his interview with Detectives Mathis and Bickford at the police service center. He argues that he was a suspect in custody when he talked to them and, thus, that his statements were obtained in violation of Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966). He also asserts that his statements were coerced by the detectives' threats to arrest his wife and place his other child in state custody if he did not accept responsibility for the victim's injuries. The state contends that the trial court properly denied the defendant's motion to suppress his statements. It argues that initially the defendant was not a suspect and that at the point in the interview the defendant became a suspect, the detectives advised him of his Miranda rights. The state also asserts that neither detective threatened the defendant.

At the suppression hearing, Detective Bickford testified he spoke with the defendant when he and his wife arrived at the police services center on August 11, 2001. He said he and Detective Mathis told the defendant and his wife that they were looking into the details concerning the death

of the victim, that they would speak with the defendant first, and that the participation of the defendant and his wife was voluntary. He said that they left April Williams in the hallway and that the defendant accompanied them to Detective Mathis' office. He said they shut the door but informed the defendant he was free to leave. He said they began the interview at 3:47 p.m. but did not start the tape recording until 4:51 p.m. because the defendant was not a suspect until that time. He said that when the interview began, the defendant was not in custody and was free to walk out of the office at any time he chose. He said that at that point in the investigation, they wanted to talk to anyone who could have been involved with or had any control of the victim. He said they did not threaten the defendant or insinuate he must cooperate with them to protect his family. He said that they asked him if he would agree to take a polygraph test and that he responded affirmatively. He said that when the defendant demonstrated to them how he bounced the baby on the bed, Detective Mathis stopped the interview, informed the defendant he was a suspect, and advised him of his Miranda rights. He said that they gave him a rights waiver form to sign in the event he agreed to give a statement and that he did agree. He said that at 5:14 p.m., they finished taking his tape recorded statement and advised him he was under arrest for the first degree murder of his child.

On cross-examination, Detective Bickford testified that they did not discuss the defendant's treatment of the victim during the first forty-five minutes of the interview. Instead, he said they discussed the defendant's version of the events of July 31 and August 1, which was not inconsistent with other information they had gathered. He said that later in the interview they discussed the defendant's taking a polygraph test and how he would feel if he did not pass it. He said the defendant became agitated at this point and asked them why he was being singled out. He said that Detective Mathis asked him if he might have been angry with his wife and done something to cause the victim's injuries. He said the defendant appeared shaken and admitted he had bounced the baby on the bed. He said the defendant demonstrated the bouncing action with his hand. He said that Detective Mathis stopped the interview at that time but that the defendant had not made any incriminating statements before that point.

April Williams testified that she waited in the hallway of the police services center while the detectives interviewed the defendant and that the interview lasted from 3:30 or 3:45 until 5:15 p.m. She said Detective Bickford emerged at that time and told her the defendant wanted to talk to her. She said the defendant looked like he wanted to cry. She said he told her that he confessed to causing the victim's injuries and that he did it to prevent her arrest and to prevent Victoria from being "lost in the system."

The trial court found that the initial purpose of the interview was to gather facts relating to the crime and that the defendant could have responded negatively when the detectives asked him if he could have done something to injure his child but, instead, the defendant's demeanor changed which indicated to the detectives he was involved in some way. The trial court found that at the time the defendant became a suspect, the detectives advised him of his Miranda rights. The trial court also found the defendant's talking with the detectives was voluntary and without the influence of threats, coercion or fear.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). The application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). Further, questions of the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. at 628. The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." Odom, 928 S.W.2d at 23. Finally, both the proof adduced at the suppression hearing and the proof adduced at trial may be considered in reviewing the trial court's decision on the motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

In Miranda v. Arizona, the United States Supreme Court held that pursuant to the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination, police officers must advise a defendant of his or her right to remain silent and right to counsel before they may initiate custodial interrogation. 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966). "Custodial interrogation" was defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444, 86 S. Ct. at 1612. If these warnings are not given, statements elicited from the individual may not be admitted in the prosecution's case-in-chief. Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528 (1994) (citing Harris v. New York, 401 U.S. 222, 91 S. Ct. 643 (1971)). A waiver of constitutional rights must be made "voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. In determining whether a defendant has validly waived his Miranda rights, courts must look to the totality of the circumstances. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992).

The record reflects that the defendant was not in custody and supports the trial court's finding that the interview of the defendant on August 11 by Detectives Mathis and Bickford was for the purpose of gathering facts in the investigation of the death of the defendant's child. The defendant drove himself to the police services center and the record does not reflect that he was deprived of his freedom of action in any significant way. Detective Bickford testified he informed the defendant at the beginning of the interview that he was free to leave and not a suspect, and the trial court accredited the detective's testimony regarding the defendant's status at this point in their investigation. Near the conclusion of the defendant's tape recorded interview, the defendant acknowledged that they had informed him at the beginning of the interview that he was not under arrest, that he was free to leave, and that the detectives only wanted to talk to him about what had occurred in an effort to discover who had caused the victim's injury.

Detective Bickford also testified that at the point the defendant became a suspect, he and Detective Mathis advised him of his rights under Miranda. The record reflects that the incriminating statements were made after he was advised of these rights and that he waived them. The defendant asserts that he was coerced and threatened during the first portion of the interview, which was not tape recorded. He implies his waiver was involuntary. However, the trial court found the

defendant's statements were voluntary and given without the influence of threats, coercion or fear. The record does not preponderate against this finding. Instead, it reveals that the detectives asked the defendant how he had been treated at the conclusion of the tape recorded interview and that the defendant replied he had been treated fairly and without disrespect. He also denied being "cussed" or "threatened" and agreed he had been treated "like a gentleman." We conclude the trial court did not err by denying the defendant's motion to suppress his statements.

### III. DENIAL OF A FAIR TRIAL

The defendant contends that Detective Bickford's testimony concerning a polygraph test and the defendant's prior convictions created unfair prejudice which denied the defendant his right to a fair trial. The state responds that the detective's reference to the polygraph test was minor and that the defendant testified about his prior conviction for theft at trial. The state contends that the trial court promptly instructed the jury to disregard these statements and that the jury may be presumed to have followed these instructions. As a result, it argues any error would be harmless. We agree with the state.

The following colloquy occurred while Detective Bickford was testifying regarding statements made by the defendant at the police service center before the tape recorder was turned on:

| | |
|---|---|
| [PROSECUTOR]: | Did you discuss with [the defendant] at all the results of the autopsy? |
| BICKFORD: | At that time, we had not. We asked him if he had a criminal record. |
| [PROSECUTOR]: | Okay. |
| BICKFORD: | He stated that he had nothing major -- |
| [DEFENSE]: | Objection, Your Honor. |
| COURT: | Sustain. |
| [PROSECUTOR]: | Move on. |
| BICKFORD: | He stated he had nothing -- |
| [PROSECUTOR]: | No, move past that question. |
| [DEFENSE]: | I ask that that be stricken, Your Honor. |

-19-

COURT:          Let that last statement be stricken, the jury is
                to disregard it.

[PROSECUTOR]:   Move on to the next thing.

BICKFORD:       We asked [the defendant] if he'd submit to a
                polygraph test during the investigation.

[DEFENSE]:      Your Honor, may we approach, please?

At this time, a bench conference was held out of the hearing of the jury after which the trial court gave the following instruction: "Members of the jury, disregard the last comment about the polygraph, it's not for the jury's consideration.  Let that be stricken."

The record reflects that after Detective Bickford concluded his testimony, the trial court gave additional instruction:

> Members of the jury, before we begin, I am going to give you an instruction.  There was some mention, the last witness that testified, about a polygraph.  At that time there was an objection made.  If you don't know what a polygraph is, a polygraph is what was . . . called a lie-detector test.  And I do want to instruct you at this time to totally disregard that.  As I said before, it's totally immaterial, it doesn't make any difference whether a defendant in a criminal case takes a lie-detector test or doesn't take a lie-detector test, because it's not admissible.  It's not been scientifically proven to be valid enough to be accepted in a court of law as proof, so it really wouldn't make any difference one way or the other.  I felt like that needed to be cleared up and, so, take that with you back in the jury room when you decide.

The results of a polygraph examination are not admissible as evidence.  State v. Hart, 911 S.W.2d 371, 377-378 (Tenn. Crim. App. 1995).  The results of such tests are considered unreliable, and the fact that a defendant either offered to take, took, or refused to take a polygraph examination cannot be considered by a jury.  Id. at 378.  In this case, the trial court sustained the defendant's objection and, shortly thereafter, instructed the jury concerning polygraph tests, i.e., it explained that the tests are not reliable, that the circumstances surrounding such examinations are not admissible, and, thus, that the issue whether the defendant took a polygraph test is immaterial.  The jury is presumed to follow the instructions of the trial court.  See State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994).  Under the circumstances, we believe the detective's reference to a possible polygraph test did not cause prejudice or render the defendant's trial unfair.

With regard to the defendant's prior convictions, the detective stated only that the defendant had informed him his criminal record contained "nothing major."  Again, the record reflects the trial

court promptly instructed the jury to disregard the detective's statement and, as we noted, the jury is presumed to follow the trial court's instructions. The record also reflects that the defendant testified concerning his theft conviction, which gave him an opportunity to explain the circumstances surrounding the incident. We believe that the detective's misstatement did not prejudice the defendant's case.

## IV. PROSECUTORIAL MISCONDUCT

The defendant contends that the state made improper remarks during its closing argument which shifted the burden of proof to the defendant and requires reversal of his convictions. The state responds that the defendant's failure to object at trial or raise the issue in his motion for new trial waives this issue on appeal. The state also contends that given the great weight of evidence against the defendant, any errors in the prosecutor's closing argument would not have affected the results of the trial on the merits and, therefore, do not rise to the level of plain error.

On appeal, the defendant objects to the following emphasized portions of the prosecutor's closing argument:

> Ladies and gentlemen of the jury, I submit to you that the only thing you should have reasonable doubt about right now is what it is the defense wants you to believe about what happened. Was it a vaccine, was it teething medicine? What is it they're trying to get you to believe?

> He's tried to suggest that some kind of vaccine could have caused these injuries. Four different doctors were asked, four different doctors have no idea what he's talking about. <u>Did he tell you which vaccine it was supposed to be that was supposed to do this</u>? Did he tell you when [the victim] supposedly had this vaccine that was supposed to do this? No.

> Teething pills. Four different doctors, two of them specialists in pediatrics, <u>did he ask any one of them if teething pills could have done this</u>? No. You know why? Because they knew it couldn't have, okay? They've been very clear about where her injuries came from.

> And he attacks Dr. Kessler about his comments about something off the internet and he states he can pull up Kessler's literature off the internet. He's right, he can pull up literature from a bunch of doctors off the internet. So why didn't he? <u>Why is something you got something not written by a medical doctor and something that doesn't support his position, since it is so easy to get</u>

this information off the internet? Because there is none? I think that's clear.

(Emphasis added). We note the record reflects that the defendant did not object.

When a prosecuting attorney makes objectionable remarks during closing argument, but no contemporaneous objection is made, the complaining defendant is not entitled to relief on appeal unless the remarks constitute "plain error." See T.R.A.P. 3(e); Tenn. R. Crim. P. 52(b). To determine whether the challenged remarks constitute plain error, we consider five factors. See State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000). Those factors are: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice." Id. at 282 (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established before we will find plain error. See Smith, 245 S.W.3d at 283. Ultimately, the error must have been "'of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (Tenn. Crim. App. 1994) (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir.1988)).

With respect to the challenged portion of the prosecutor's closing argument, the first factor has been established. However, we do not believe that the prosecutor's questions as to why defense counsel did not support certain arguments breached a clear and unequivocal rule of law. We conclude that the prosecutor's comments did not impermissibly shift the burden of proof to the defendant. Taken in context, the remarks were a challenge to the credibility of the defendant's theories regarding how the victim's brain became injured. During the trial defense counsel presented various hypotheses, including that the injury could have been a vaccine reaction or related to the fact that she was teething. The prosecutor wanted the jury to reject these theories. In any event, because the failure to establish one factor means plain error cannot be found, the defendant is not entitled to relief on this issue.

## V. SENTENCING

The defendant contends that the trial court's application of enhancement factors is error in light of the rule announced in Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004). He also contends that the trial court erred by refusing to give him "full credit" and mitigate his sentence based upon the loss of his child, lack of a felony record, the fact that the defendant is a father to other children, and evidence suggesting he became a better person while in jail and had a hard life growing up.

Jim Osterhout testified at the sentencing hearing that he worked for the Board of Probation and Paroles and that he prepared the defendant's presentence report. He said the defendant's criminal record contained one misdemeanor conviction for assault and a second misdemeanor conviction for theft under $500. He said that the sentence on the assault conviction was suspended

but that a probation capias was issued and the defendant's probation was revoked for fourteen days. On cross-examination, Mr. Osterhout acknowledged the defendant had no juvenile record. The defendant's attorney asked whether Mr. Osterhout was aware that the defendant's probation was revoked for failure to do public workdays, and he said he was not. He also said he did not know why the defendant failed to perform this obligation.

April Williams testified that she had been married to the defendant since May 20, 1998, and that they dated for three years beforehand. She admitted that their relationship had a history of domestic violence and that they both had assault convictions in their records. She said that she called the police on one or more occasions because the defendant would not leave the house and that she called the police another time because she was unable to breathe when she discovered he was dating another woman. She said she also called the police on days when the defendant was late coming home or would not return their older daughter, Victoria. On cross-examination, she acknowledged that the defendant is a loving, patient, and kind parent and that he has grown mentally and spiritually since the loss of his daughter.

United States Postal Inspector Mike Owens testified that the defendant was a suspect in a series of mail thefts occurring at the main processing facility between December 2000 and June 2001. He said that the defendant was employed at the facility at that time and that he was terminated on June 18, 2001, for excessive absences. Mr. Owens said that he began investigating the losses and that they stopped after the defendant's termination. He said that the United States Postal Service made arrangements to serve the defendant with a grand jury subpoena but that he was arrested in the interim. He said that he made arrangements to talk to the defendant and that he did so on August 13, 2001. He said that he advised the defendant of his rights and that the defendant signed a waiver and admitted being involved in the thefts of approximately thirty guns and various pieces of jewelry from the mail. Mr. Owens estimated the value of the stolen property to be between $8,000 and $10,000. He said the defendant made a statement and requested that Mr. Owens write it because the defendant did not write well. He said that they reviewed the statement together and that afterward the defendant acknowledged with his signature both the statement and the fact that Mr. Owens wrote it for him. The statement was read into evidence at the sentencing hearing. Regarding future prosecution, Mr. Owens said that the United States Attorney's Office had decided to put the case on hold pending the outcome of the present case.

Brenda Faye Heard, the defendant's mother, testified that the defendant liked to help people and that he had never caused trouble or deliberately hurt anyone. She said that he was a good person and that he was good with children. Debbie Ramseur, a friend of the defendant, testified that the defendant had a hard life, always protected his mother, and loved children. She said she noticed the defendant appeared prideful during the trial and was "not ashamed of anything." Angela Montgomery, the defendant's sister-in-law, testified that the defendant was a loving person and that he was gentle while playing with her four-year-old son.

The defendant made a statement to the trial court in accordance with T.C.A. § 40-35-210(b)(6). He said that he was sorry but that he did not do anything wrong. He claimed he was not

-23-

convicted based on his actions but because of the false statement he made to protect his family. He requested that the trial court be lenient and that he be forgiven. He said that he had prayed for the truth to come out and that his conviction is baseless.

The trial court applied the following enhancement factors as provided in T.C.A. § 40-35-114: (2) the defendant has a previous history of criminal convictions or criminal behavior in addition to that necessary to establish the appropriate range, (5) the victim of the offense was particularly vulnerable because of her age, (9) the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community, (16) the defendant abused a position of private trust, and (19) the victim of aggravated child abuse suffered permanent impairment of either physical or mental functions as a result of the crime.

Regarding the mitigating factors presented by the defendant, the trial court declined to apply factor (11), appropriate when the defendant committed the crime under such unusual circumstances that it is unlikely a sustained intent to violate the law motivated his conduct. See T.C.A. § 40-35-113. The trial court also declined to find as mitigating factors the defendant's loss of his daughter, the fact that he has other children, and the lack of felony convictions. The trial court found the fact that the defendant had strong family support and some community support appropriate as mitigating circumstances, but determined that these factors deserved minimal weight compared to the great weight afforded the applicable enhancement factors. The trial court then sentenced the defendant to the maximum punishment of twenty-five years for the aggravated child abuse conviction and the maximum punishment of four years for the reckless homicide conviction.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994). In conducting a de novo review, we must also consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

The range of punishment for a Range I offender is fifteen to twenty-five years for a Class A felony and two to four years for a Class D felony. T.C.A. § 40-35-112(a)(1), (4). Unless there are enhancement factors present, the presumptive sentence to be imposed is the midpoint in the range for a Class A felony and the minimum in the range for a Class D felony. T.C.A. § 40-35-210(c). Our sentencing act provides that procedurally, the trial court is to increase each sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

In Blakely, the United States Supreme Court held that other than prior convictions, any facts not reflected in the jury's verdict and used to increase a defendant's punishment above the presumptive sentence must be admitted by the defendant or found by the jury beyond a reasonable doubt. 542 U.S. at ____, 124 S. Ct. at 2537. This court has previously concluded that Blakely affects the 1989 Sentencing Act. See State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, White County, slip op. at 19-21 (Tenn. Crim. App. Nov. 30, 2004), app. denied (Tenn. Mar. 21, 2005). However, the Tennessee Supreme Court has recently held that Tennessee's sentencing procedures do not violate the Sixth Amendment right to jury trial described in Blakely and United States v. Booker, ____ U.S. ____, 125 S. Ct. 738 (2005). See State v. Edwin Gomez and Jonathan S. Londono, No. M2002-01209-SC-R11-CD, Davidson County, ___ S.W.3d ____, (Tenn. April 15, 2005). Accordingly, the defendant's reliance upon Blakely is misplaced. Otherwise, we see no problem with the trial court's application of enhancement factors.

Relative to mitigating factors requested by the defendant, the trial court said the defendant was not entitled to mitigation for loss of the daughter he killed. It also concluded that although the defendant lacked felony convictions, he had a misdemeanor record and admitted to felony thefts. We do not believe that these circumstances justify any mitigation.

The trial court, without explanation, did not believe that the existence of the defendant's two other children should mitigate the sentence. Also, it made no finding regarding the defendant's good conduct while in jail or his tough circumstances growing up. Although we acknowledge that such circumstances can be viewed in mitigation under certain circumstances, we do not believe the record justifies a reduction in the sentence.

Based upon the foregoing and the record as a whole, we affirm the judgments of conviction.

 

_____
JOSEPH M. TIPTON, JUDGE